J-S15016-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: D.B.-L.C. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.B.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 278 WDA 2021 |

Appeal from the Order Entered January 25, 2021
In the Court of Common Pleas of Clearfield County
Orphans' Court at No(s): 3569-2020

| | | |
|---|---|---|
| IN RE: A.B.C. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.B.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 279 WDA 2021 |

Appeal from the Orders Entered January 25, 2021
In the Court of Common Pleas of Clearfield County
Orphans' Court at No(s): 3568-2020

BEFORE:   LAZARUS, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.:                    **FILED:  July 30, 2021**

M.B.C., (Father), appeals from the orders involuntarily terminating his

parental rights to his daughter, A.B.C., born November 2004, and his son,

_____

[*] Retired Senior Judge assigned to the Superior Court.

D.B.-L.C., born September 2009 (collectively, the Children).[1]   Upon careful review, we affirm.

On September 22, 2020, the orphans' court terminated the parental rights of K.T. (Mother), who did not appeal.  Mother had executed a voluntary placement agreement with Clearfield County Children, Youth, and Family Services (CYF) on April 25, 2017.  N.T., 11/5/20, at 50.  The court adjudicated the Children dependent on May 23, 2017, and their permanency goal at that time was reunification.

At the time of the Children's placement — and for reasons not specified in the record — Father had supervised visits with the Children through the Safe Haven program.  *Id.* at 57-58.  The visits occurred weekly, and Father was permitted to telephone the Children on Mondays, Wednesdays, and Saturdays.  *Id.* at 58-59.  The CYF caseworker, Ms. Vicklund, testified that until and including August 12, 2017, Father consistently attended supervised visits, which went "very well."  *Id.* at 58-59.  Father was also consistent in telephoning the Children.  *Id.* at 59.  However, with the exception of the four-month period from April to August 2017, Father has been incarcerated during the Children's dependency.

On August 15, 2017, Father was sentenced in Cumberland County to serve four to eight years in prison, followed by 24 months of probation, as the

---

[1] This Court consolidated the appeals *sua sponte*.  Order, 4/12/21.

result of Father pleading guilty to statutory sexual assault, 18 Pa.C.S.A. § 3122.1(b). *Id.* at 79, 100; Orphans' Court Opinion, 1/25/21, at 2, n.2. Father's last supervised visit with the Children occurred on August 12, 2017. *Id.* at 59. While in prison, Father's permanency objectives included completing programs. N.T., 11/5/20, at 54. Upon release, Father was to submit to a mental health evaluation and successfully complete recommendations, and obtain and maintain a home free of safety hazards. *Id.* at 54.

The court continued to hold regular permanency review hearings, and beginning in March 2018, Father telephoned the Children from prison without incident. *Id.* at 60, 65. On August 6, 2018, the court changed the Children's permanency goal from reunification to adoption. Father subsequently acknowledged having an inappropriate conversation with the Children in October of 2019, which caused the Children to not want further communication.[2] *Id.* at 64. Following a permanency review hearing in May 2020, the court suspended Father's telephone calls. *Id.* at 81-82, 102.

On May 12, 2020, CYF filed petitions for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The hearing occurred on November 5, 2020, during which a guardian

_____

[2] Father testimony was that he told A.B.C., "I just don't want you to end up going down that road, you know, stealing and dressing skimpy to have a boy notice you." N.T., 11/5/20, at 154.

*ad litem* (GAL) represented the Children's best interests, and separate counsel represented the Children's legal interests.

CYF presented the testimony of Allen Ryen, Ph.D., a licensed psychologist and expert in child psychology, and Crystal Vicklund, the CYF caseworker. Father, then incarcerated at State Correctional Institution (SCI) Huntingdon, appeared in person to testify. Father also presented testimony from Mark Grimme, his former corrections counselor.

By orders dated and entered January 25, 2021, the orphans' court involuntarily terminated Father's parental rights pursuant to the four statutory subsections alleged in the petitions. On February 23, 2021, Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Father presents the following issues:

1.  Did the [orphans' court] err as a matter of law in terminating [Father]'s parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) without the support of competent evidence[?]

2.  Did the [orphans' court] err as a matter of law in terminating [Father]'s parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) without the support of competent evidence[?]

3.  Did the [orphans' court] err as a matter of law in terminating [Father]'s parental rights pursuant to 23 Pa.C.S. § 2511(a)(5) without the support of competent evidence[?]

4.  Did the [orphans' court] err as a matter of law in terminating [Father]'s parental rights pursuant to 23 Pa.C.S. § 2511(a)(8) without the support of competent evidence[?]

> 5.      Did the [orphans' court] err as a matter of law in terminating [Father]'s parental rights pursuant to 23 Pa.C.S. § 2511(b) without the support of competent evidence[?]

Father's Brief at 4-5.[3]

We review termination rulings for an abuse of discretion. Our Supreme Court has explained:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the

---

[3] The Children's legal counsel filed an appellate brief in support of the termination orders and referenced the Children's preference for termination. Brief of Children at 5. The GAL did not file a brief, although the orphans' court stated the GAL joined legal counsel's request for termination and "believes it is in the Children's best interests[.]" Orphans' Court Opinion, 1/25/21, at 11.

- 5 -

needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, we conclude that the certified record supports termination pursuant to Section 2511(a)(8) and (b), which provide:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b); *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating we need only agree with the trial court

as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm).[4]

This Court has explained, "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the child welfare agency supplied over a realistic time period. *Id.* The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of the agency's services. *In Re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003).

This Court has explained:

[T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to

_____

[4] Accordingly, we do not consider Father's first, second, and third issues concerning Section 2511(a)(1), (2), and (5).

perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re J.F.M.*, 71 A.3d 989, 997 (Pa. Super. 2013) (quoting *I.J.*, 972 A.2d at 11-12).

Finally, the court must consider whether termination of parental rights would best serve the needs and welfare of the child. *In re Adoption of M.E.P.*, *supra* at 1275-1276. The "needs and welfare" analysis is relevant to both Sections 2511(a)(8) and (b). In *In re Adoption of C.L.G.*, 956 A.2d 999 (Pa. Super. 2008) (*en banc*), this Court stated,

while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*Id.* at 1009 (citations omitted).

With respect to Section 2511(b), we have explained, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis,

therefore, necessarily depends on the circumstances of the particular case."
***In re K.Z.S.***, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

Father argues the orphans' court abused its discretion in concluding his conduct warranted termination under Section 2511(a)(8). Father emphasizes that he attempted to telephone the Children "non-stop from December 2019 through May of 2020," and only one call was answered. Father's Brief at 12. It is undisputed that Father made numerous telephone calls to the Children from prison. ***See*** N.T., 11/5/20, at 95 (Ms. Vicklund testified Father "was very good at trying to communicate with [the C]hildren."). However, the Children, who were ages 10 and 15 in May of 2020, refused to speak to him. ***See id.*** at 95 (Ms. Vicklund testifying the Children told her multiple times that they did not want to speak to Father).

Father also emphasizes that CYF "admits" he "conducted all visits appropriately." Appellant's Brief at 14. While this fact is not disputed, Father was incarcerated four months after the Children's placement in April 2017, and never progressed to unsupervised visits. Father asserts he is "likely" to "be released on parole in August 2021, even recognizing [he] may not immediately have the means to remove the children from foster care, it is important to acknowledge the mere possibility." ***Id.*** at 24. Father testified that he expects to be released from prison on his minimum sentencing date, August 20, 2021. ***See*** N.T., 11/5/20, at 104, 107, 115-116 (Mr. Grimme testified Father was "not a problem" in prison, and "on target" to complete the

required programs in his "correctional plan" by his minimum release date.). Nonetheless, Ms. Vicklund testified that CYF sought termination of Father's parental rights because of the length of time the Children had been in care, which was then more than three and a half years. *Id.* at 93. In addition, the orphans' court opined that even if Father is released on his minimum date, the court would not place the Children in his custody at that time. Orphans' Court Opinion, 1/25/21, at 9. Thus, the Children had been removed from Father's care far in excess of the 12-months set forth in Section 2511(a)(8), and conditions that led to their placement continued to exist.

With respect to the needs and welfare element of Section 2511(a)(8), Father argues that termination may not establish permanency for the Children. Appellant's Brief at 24-25. Father references A.B.C.'s removal from the foster home where she resided with her brother and placement in a different foster home. Father claims that even without communication with him for many months, A.B.C. had not progressed toward permanency.

Ms. Vicklund testified that A.B.C. was placed in a new foster home on July 8, 2020 for reasons related to her mental health. N.T., 11/5/20, at 67, 69. A.B.C. has been diagnosed with Attention Deficit Hyperactive Disorder (ADHD)-combined type; Oppositional Defiant Disorder (ODD); Reactive Attachment Disorder (RAD); Unspecified Anxiety Disorder; Unspecified Trauma and Stress-Related Disorder; suspected sexual abuse; educational problems; and peer-relationship problems. *Id.* at 74-75. Ms. Vicklund

testified ABC "responds very well" to her new foster family. *Id.* at 72. Ms. Vicklund continued, "She has adjusted very well. It seems, with them being a younger family, she is more able to connect with [them]." *Id.* Moreover, the placement is a "pre-adoptive home," and A.B.C. wants to be adopted. *Id.* at 67, 76.

With regard to D.B.-L.C., Ms. Vicklund testified he has been diagnosed with "ADHD-predominantly hyper, active impulsive type; autism spectrum with intellectual impairment, with an IQ of 43; other [un]specified tick; history of sexual abuse; Unspecified Trauma Disorder." *Id.* at 75. He has lived in the same foster home since April 2017, and it is a pre-adoptive placement. *Id.* at 66-67. Like his older sister, D.B.-L.C. desires adoption. *Id.* at 76.

Dr. Ryen met with the Children once in 2017, and once in 2019, to perform bonding assessments with Mother and determine "the impact of maternal contact on the[ir] behavior and adjustment." *Id.* at 14. He testified, "Both children were pretty strong in their expression of this desire to be adopted." *Id.* at 22.

In 2017, Dr. Ryen thought that A.B.C., then 12-years-old, "was a very anxious, constricted child." *Id.* at 18. He found in 2019 that "she made a lot of progress in her adjustment." *Id.* at 21-22.

With respect to D.B.-L.C., who was eight years old in 2017, Dr. Ryen found him to be "extremely withdrawn, extremely immature. I think I used the word infantile in describing [him]. I knew that he had been diagnosed

- 11 -

prior to my contact with Pervasive Developmental Disorder. I didn't disagree with that." *Id.* at 19. He further stated D.B.-L.C.:

> was almost nonverbal. It was very difficult if I got him to interact with me at all. I had to revert to some rather silly innovations, which got his attention. . . . And from there, he was able to talk to me a little bit. Speech was fluent, but speech was limited.

*Id.* at 19-20.

> In 2019, Dr. Ryen found:
>
> [D.B.-L.C.] had made an awful lot of progress developmentally. [S]ocially, I thought he was adjusting better than he had been early on. I still had concerns with development, . . . with his social skills, his social awareness.
>
> I thought that the Pervasive Developmental Disorder diagnosis probably still fit pretty well but that evidence . . . had been weakened by the progress that he had made.

*Id.* at 22-23.

> Dr. Ryen concluded:
>
> I believe the [C]hildren should be adopted, so they can continue their progress toward adult life and develop those skills and so forth that they need to be successful in adult life.
>
> I don't think it's fair to them to continue to postpone permanency until [F]ather [is] available and until [F]ather can provide evidence to the agency that he could be a stable, positive influence in their lives.

*Id.* at 33.

Based on the record evidence, the court did not abuse its discretion in terminating Father's parental rights pursuant to Section 2511(a)(8). Dr. Ryen's testimony belies Father's argument that termination may not best serve the Children's needs and welfare. Indeed, the Children have made much

- 12 -

progress with their mental health while in foster care, and they both indicated a desire to be adopted.

Father's fifth and final issue concerns Section 2511(b), *i.e.*, the developmental, physical, and emotional needs and welfare of the Children, and he incorporates his argument under Section 2511(a)(8). Father asserts:

> [S]imply terminating his rights does not provide the [C]hildren with any further ability to obtain permanency. [Father] contends that permanently severing the bond between him and [C]hildren would be detrimental to the [C]hildren's well-being. The only testimony regarding the bond between [Father] and [C]hildren stems from assessments conducted by Dr. Ryen that did not focus on the [C]hildren's relationship with [Father].

Father's Brief at 27.

Although Dr. Ryen did not perform a bonding assessment specific to Children and Father, the orphans' court was not required by statute or precedent to order a formal bonding evaluation. *In re K.K.R.-S*., 958 A.2d 529, 533 (Pa. Super. 2008). Further, this Court has explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

In analyzing the Children's needs and welfare under Section 2511(b), the orphans' court explained:

> In Dr. Ryen's expert opinion, even if the bond between Father and the Children was positive and strong prior to Father's incarceration, Father's absence has significantly weakened any bond that may have existed. He opined severing a weakened bond would be less harmful to the Children than keeping the Children in a legal limbo to see if Father is able to be a permanent caretaker for the Children. [N.T., 11/5/20, at 29-30].
>
> Testimony provided showed both Children have received significant care in regards to their mental health, and both Children have drastically improved since receiving the treatment and structure found in their foster homes. Father himself agreed that the foster homes are the best place the Children have been since at least 2015 when they last resided with him. [N.T., 11/5/20, at 138-139, 144]. Furthermore, Father acknowledged that he did not want to remove the Children from the foster homes as it was in their best interest to remain living with the families. [*Id.* at 144].
>
> If this [c]ourt does not terminate Father's rights, the Children will have been in care for nearly five years before Father could be considered as a placement option. This places the Children in "a state of proverbial limbo in anticipation of a scenario that is speculative at best." *In re C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008). The Children have advanced needs to ensure their mental health is taken care of; additionally, both Children have created bonds with their foster families and are thriving in their foster homes. . . . The Children deserve finality and stability. Nearly four years have passed since the Children have been in the

custody of CY[F]. . . . This [c]ourt can find no reason that prolonging adoption would benefit the Children.

Orphans' Court Opinion, 1/25/21, at 10-11.

Upon review, we discern no abuse of discretion. Accordingly, we affirm the orders involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/30/2021